ROGERS *v.* GALLOWAY FEMALE COLLEGE.

Opinion delivered January 22, 1898.

SUBSCRIPTION FOR COLLEGE—LOCATION.—Where a gratuitous subscription for the establishment of a college stipulated that it should be located at a certain incorporated town, and there was no question raised, at the time the subscription was made and accepted, as to whether the college would be located within or without the corporate limits of such town, the location of the college beyond the corporate limits, but not beyond the aggregation of dwelling houses composing the town, as distinguished from the adjacent country, was a sufficient compliance with the condition of the subscription. (Page 631.)

WHEN SUBSCRIPTION BINDING.—A gratuitous subscription will be considered as only a continuing offer to make a gift; and until accepted by the promisee, and acted upon in such a manner as to raise a consideration, it may be withdrawn. (Page 636.)

SAME.—Where a committee authorized to locate a college proposed to locate it at a certain town if its inhabitants would raise a subscription fund of $25,000, and a subscription list was accordingly signed for various amounts, aggregating the required sum, the subscribers thereto became liable upon the acceptance of the list by the committee. (Page 636.)

CONDITIONAL SUBSCRIPTION—WHEN BINDING.—Where a committee authorized to locate a college proposed to locate it when the sum of $25,000

was subscribed, neither the committee · nor the subscribers are bound, under the terms of such offer, if less than the sum specified is subscribed. (Following *Turner* v. *Baker*, 30 Ark. 186.)   (Page 638.)

FINDING OF CHANCELLOR—WHEN SUPPORTED BY EVIDENCE.—A finding of the chancellor that a certain subscription list aggregated the sum of $25,000 will be supported by evidence that all but $1,364 was subscribed, and that six subscribers signed a written guaranty "to make up the balance, $364."   (Page 638.)

ESTOPPEL—CONDUCT.—One will not be heard to deny the existence of a certain state of facts which he, either in express terms or by conduct, represented as existing, and which he intended to be acted upon by another in a certain way, and which was acted upon in good faith by the other, to his detriment.   (Page 639.)

CONDITIONAL SUBSCRIPTION—WHEN BINDING.—Where, in making a subscription of $2,500, it was a condition precedent to any liability thereon that three others should sign for the same amount, the condition is complied with if there are three other subscriptions for the same amount, although one of the subscribers had a private understanding with an outsider that the latter would assist in raising the amount of such subscription.   (Page 640.)

PARTY—RIGHT TO SUE UPON SUBSCRIPTION.—Where a subscription is made for the purpose of securing the establishment of a college at a certain town, such college, subsequently incorporated and established, is entitled to sue upon such subscription, as being the beneficiary thereof. (Page 643.)

Appeal from White Chancery Court.

THOMAS B. MARTIN, Chancellor.

*Cockrill & Cockrill*, for appellants.

There can be no recovery upon the note sued on, because the college was located outside the town of Searcy.   "*In*," as used in this case, means "within" or "inside of."   Century Dict., definition of "In"; Webster's Dict., definition of "Within"; 2 Parsons, Cont. § 527; 30 Ark. 186; 82 Tex. 553, 559; 32 Md. 37.   So with the preposition "at."   1 Ark. 171, 180, 181; 3 Cranch (C. C.), 599, 606; 1 Bish. Dir. & Forms, § 80; 1 Bish. Cr. Pro. § 378; 30 Tex. App. 416; 53 L. J. Q. B. 437; 91 U. S. 348; 72 Miss 960; 81 Me. 63; 85 Me. 17, 28; 8 L. R. C. Div. 738.   But "in" is stronger than "at."   51 Wis. 62, 71; Standard Dictionary, "At"; 30 Ark. 186; 41 Ark. 213; 43 Ark. 184; 54 Ark. 316, 318, 319.   There can be no reformation of a contract, except in case of a mutual mistake. 39 Ark. 301, 304; 26 Ark. 28; 2 Beach, Equity, § 544;

Bispham, Eq. § 546; 40 Ill. App. 96; 49 Ark. 425. Plaintiffs acquiesced in the contract in its present form, and are bound thereby. 59 Ark. 251. The evidence shows that it was the intention of the parties that the condition should be performed, and so it is binding. 1 Story, Cont. § 32; 48 Kas. 283; 1 Beach, Cont. § 726; 55 Ark. 18, 20; 55 Ark. 112; 28 Ark. 282, 285; 23 Ark. 9; 15 Ark. 543, 549; 52 Mo. 546. Even if the alteration in the note was unauthorized, the retention of it ratified it. 2 Thomp. Corp. § 1367; 55 Ark. 112. A gratuitous subscription is only a continuing offer to make a gift, and, if withdrawn before it is acted upon by the promisee in such manner as to raise a consideration, it cannot be enforced. 1 Whart. Cont. § 518, 528, p. 718; 16 Am. Law Reg. 549; 1 Beach, Cont. § 206; 121 Mass. 528; 140 Ill. 248; 117 N. Y. 601; 70 Cal. 158; 84 Pa. St. 388; 161 U. S. 646, 666. Neither the mutual promises of the subscribers, nor the efforts of the intended donee to obtain the subscriptions, constitute a consideration. 1 Parsons, Cont. § 454; 16 Am. L. Reg. 550; 32 Conn. 412; 112 N. Y. 517, 521, 522. The obligation to pay the subscription note was dependent on the obtaining of the total amount of subscriptions. 30 Ark. 186; 84 Pa. St. 388. The burden of proving the performance of this condition precedent was on appellee. 1 Whart. Cont. § 601, 554. When a subscription is made on condition that other subscriptions be first made, this condition must be fulfilled, and that without collusion or secret understanding. 20 Vt. 509; 31 N. Y. 273; 1 Whart. Cont. 529; 1 Pars. Cont. 454; 2 Thompson, Corp. § 1956. There can be no recovery on the original subscription, because: (1) The oral contract is merged in the note, and the terms of the latter can not be varied by parol; and hence, the suit on the note failing, the controversy ends. (2) The plaintiffs were neither parties nor privies to the original contract. 74 N. Y. 77; 140 Ill. 248; 35 Me. 405; 2 Beach, Corp. § 512. (3) The original subscription was void for non-compliance with conditions precedent. The subscription is also void because the college was not located by the committee agreed upon.

*J. N. Cypert, Green & Hicks, W. B. Smith* and *J. W. House,* for appellee.

For definitions of "at" and "in," see Webster's International Dict.; Standard Dict. The testimony does not indicate that the intention was that the college was to be within the corporate limits of the town; and since the change from "at" to "in" was made by appellant, the court should have reformed the note, so as to conform to the original undertaking. 2 Beach, Eq. 544; 2 Pomeroy, Eq. Jur. 847, 870; 47 N. J. Eq. 218; 69 Md. 437; 44 N. Y. 525; 28 N. Y. 310; 2 Curt. (U. S.) 277; 49 Ind. 490; 105 Pa. St. 555; 55 N. Y. 240; 46 Am. & Eng. R. Cas. 232; 29 S. W. 669; 36 Kas. 41; 62 Ark. 143. Appellant never withdrew his offer to subscribe, and, besides, when the subscription was presented and accepted, the contract was closed, and he had no power to withdraw it. The appellee assumed an obligation, and this was a consideration. 1 Beach, Cont. 65; Cook, Stock & Stockholders, § 84; 24 Ark. 201; 25 Am. Rep. 511; 112 U. S. 327; 12 N. Y. 25; 121 Mass. 528; 40 Ill. 379; 83 N. Y. 26; 15 O. St. 334; 29 Mo. 320; 20 O. St. 197; 32 S. W. 716; 59 Tex. 438; 6 Pick. (Mass.) 433; 12 Pick. 541, 544; 44 Am. & Eng. Ry. Cas. 251; 1 Beach, Corporations, § 109; 2 *ib.* 532; 70 Cal. 158; 17 Am. Dec. 387; 25 Am. Rep. 510; 33 Am. Rep. 384; 40 Ill. 379; 34 Vt. 189; 20 Pa. St. 260; 2 Denio, 416; 49 N. W. 157; 59 N. W. 515; 42 N. W. 17; 73 Me. 143; 3 Atl. 430; 9 Cush. 539; 5 Pick, 509; 24 Vt. 192; 27 Wis. 214; 95 Ind. 279; 16 Ind. 370; 36 *ib.* 375; 53 *ib.* 326. Expenses had been incurred; hence there could be no withdrawal. 112 U. S. 327; 12 N. Y. 25; 32 S. W. 716; 15 S. W. 413; 25 Am. Rep. 511. The fact that the appellee agreed to require less than the full amount of the contemplated subscription was no fraud on appellant's rights, and he, having been present at the presentation of the subscription paper, and acquiescing in same, is estopped to complain of such insufficiency of the subscription. 58 Mo. App. 391; 10 Atl. 536; 23 Ill. App. 496; 15 S. W. 413; 59 Vt. 420. The condition as to subscription of $25,000 by each of four parties was complied with, and appellant is bound by his subscription. 1 Beach, Corp. 109; 2 *ib.* 543; Cook, Stock and Stockholders, 137 and 138; Thompson, Liability of Stockholders, 122, 123 and 124; 34 Pa. St. 362; 24 Mich. 403; 24 Vt. 477; 59 Vt. 419, 420.

The subscription list constitutes a written contract. 64 N. W. 412. Even if it was a Sunday contract, it was ratified, and is enforceable. 38 Am. Rep. 159. This contract is not within the statute of frauds, and, besides, the statute is not pleaded. 56 Ark. 245. The taking of the note did not extinguish any right of action on the original subscription. 14 Wis. 16. Only a substantial compliance is demanded, in order to make this contract binding. 20 Ark. 463.

WOOD, J. This suit was to recover of one T. J. Rogers $2,500, the amount of a subscription to the Methodist Episcopal Church, South, alleged to have been given for the purpose of locating, building and maintaining a female college at the town of Searcy. The defense was that the promise was made on three conditions, viz: (1) "That three citizens of Searcy, other than himself, should subscribe $2,500 each; (2) that an aggregate of not less than $25,000 should be subscribed by the citizens of Searcy; and (3) that the college should be located within the then corporate limits of the town of Searcy," —neither of which had been performed; also (4) that the offer to subscribe was withdrawn before it was accepted; and (5) that there could be no recovery upon the original subscription.

We will consider these in the order they are presented by counsel.

First. *Was the subscription upon condition that the college should be located "within the corporate limits of Searcy?"*

The chancellor found "that Thos. J. Rogers, in his lifetime, to-wit, on or about the 27th day of February, 1888, subscribed the sum of $2,500 for the purpose of inducing the location, building, and maintaining a college for the education of females *at* the town of Searcy," etc.

In the latter part of the year 1887 the Methodist Episcopal Church, South, through its three annual conferences of the state, appointed a committee, "with unrestricted authority," "to consider the educational interests of the church in Arkansas, and to provide for the establishment of a female college, to be under the patronage of the said conferences." Several towns of the state were spoken of as suitable for the location of such a college, and were competitors for it. Among the number was Searcy. A few of its citizens invited Bishop

Galloway, who was the presiding bishop of the conferences in Arkansas, to deliver an address at Searcy, which he did on Sunday the 26th day of February, 1888. At the close of his address, he gave an opportunity to the people there assembled to subscribe to a fund for the purpose above indicated. Eugene Cypert acted as secretary or recorder, putting down the names of the subscribers and the amounts subscribed. The bishop stated that he "thought a bonus of $25,000 was necessary;" and that, while he could not "speak authoritatively for the commission," he "felt sure that bonus would secure the college." Much testimony has been adduced *pro* and *con* upon the question of whether the bishop in making the proposition, and Rogers in accepting it, for a subscription to the location of a college, used the words "in Searcy," or the words "at Searcy." As to what particular word was employed is purely a question of fact. The proof is ample to support the finding of the chancellor that "at Searcy" was used.

But it is argued that Rogers subscribed upon condition that the college was to be located *in Searcy*, meaning "within the corporate limits," and that such was the contract even if *at*, instead of *in*, was employed to express it. The preposition "*at*," when used to denote local position, may mean "*in, on, near, by*, etc., according to the context; *denoting usually a place conceived of as a mere point:* \* \* \* so with names of towns, as, *at Stratford, at Lexington*; \* \* \* but if the city is of great size, *in* is commonly used, as, *in* London; \* \* \* unless, again, the city is conceived of as a mere geographical point, as, our financial interests center *at* New York." Century Dict., "At." "With the names of cities and towns the use of *at* or *in* depends not chiefly upon the size of the place, but upon the point of view; when we think merely of the local or geographical point, we use *at;* when we think of inclusive space, we employ *in;* as, we arrived *at* Liverpool; there are a few rich men *in* this village." Standard Dict., "At." "Primarily, this word expresses the relation of presence, nearness in place \* \* \*. It is less definite than *in* or *on; at* the house may be *in* or *near* the house." Webst. Dict., "At." To determine the true sense in which words are used, we must consider the subject-matter concerning which they are

used, and the circumstances calling for their application to any given subject. *State* v. *Old Town Bridge Co.*, 85 Me. 17; *Harris* v. *State*, 72 Miss. 964.

The Methodist Episcopal Church, South, had in view the establishment of a college at some eligible town or city in the state that would offer a sufficient consideration in money to be used in erecting a college building. The church had no funds for that purpose, and was dependent upon such donations as might be offered by citizens of the town or city seeking the location, etc., of the college.

The question uppermost in the minds of the representatives of the church was to raise, as a consideration for the college location, the sum of $25,000. The proposition of locating the college *within* or *without the corporate limits* of the town or city securing the location thereof was never thought of by those who spoke for the church until after the subscription list had been tendered and accepted. Bishop Galloway testified on this point: "I do not remember that he (Rogers) asked me any question about the location *inside or outside the corporate limits of Searcy*. I do not think it was presented to me or mentioned by me when the subscriptions were taken." Many witnesses testify to the same effect, and there is no proof to the contrary. Mr. Rogers was a man of large possessions in realty in the town of Searcy and in the county of White. He was an enterprising citizen, "and manifested great interest in this project, as he usually did in all enterprises he undertook." He was present at a preliminary meeting of the citizens a few nights before the day he subscribed, announcing that he would give as much toward securing the college as any one else, and urging, with his accustomed zeal and energy, other citizens to become subscribers, and to say what they would give. At a meeting of the subscribers and other citizens on the day following the Sunday meeting, Rogers was present. This meeting was for the double purpose of ratifying what had been done the day before, and to complete the subscription list for $25,000, the amount required to secure the location. The secretary of this meeting was instructed to compose "a caption for the subscription list descriptive of the list and its purposes." That caption reads: "Following is a list

of those who have subscribed for the purpose of securing the location of the Methodist State Female College at Searcy, the amounts by them respectively subscribed being set opposite their names." It was expressly mentioned and understood at this meeting, in the presence of Rogers, that the subscriptions made by those present on the Sunday preceding were ratified. The list was completed, and, at another meeting at the church Monday night, the list of subscribers containing the above caption was presented, in a speech by Prof. Rives, Sr., on behalf of the citizens, to the church committee, and was by it, then and there, on motion, duly accepted, and the college located at Searcy. Rogers was present at all the meetings, but at none of them did he ever suggest or intimate that his subscription was grounded upon the condition, in express terms, that the college was to be located *within the corporate limits of Searcy.* Some of the largest subscribers testify that, had he done so, they would not have subscribed. In the light of events which transpired soon after the college had been located at Searcy, we think it doubtless true that Rogers was prompted to his commendable liberality and herculean endeavors in securing the location of the college at Searcy by both the desire and expectation of having the college, when built, placed upon his ground, most of which was within the corporate limits. There was every reason for him to be inspired with such a hope, and to be urged by such a motive; for the tract of land which he owned at that time in Searcy was regarded, by many as well as Rogers, as by far the most suitable site to be had for the college location. Indeed, at that time it was almost the consensus of opinion that the Rogers tract was the most eligible, and the committee to select the grounds for the college building and campus agreed to select this tract, and would have done so, but for the fact that inseperable barriers, as they supposed, stood in the way of their securing title to another small tract (Shinpoch) adjoining, which was regarded by the committee as necessary for the college campus; and, of course, the necessary grounds for the campus as well as for the building, had to be considered in selecting the situs for the college. Although Rogers doubtless had in his mind the final location of the college on his own ground, we think the fact that he and so many others considered his as the most suit-

able location made him willing to take his chances on finally securing it on his ground, after the location should be determined upon at Searcy. The paramount consideration with him was the location of the college at Searcy, without which he could not expect to have the college building located on his land. Another cogent fact showing this is that the tract which he himself preferred was not all within the corporate limits, and the only other tract which anyone considered at all suitable was not all within the corporate limits. We find nothing in the record to justify the conclusion that the parties to the contract used the word "at" in any other sense than usually indicated by the term, denoting a place conceived of as *a mere geographical point*, just as we would say, speaking of the location of a college, or some institution: "Hendrix College is located at Conway," "the University at Fayetteville;" "we are going to locate a college at Searcy," etc.

It is true that *at* is often used to denote inclusive space, and such is the case when it is used, as it frequently is, to lay the venue in criminal cases, it being necessary in those cases to show that the crime was perpetrated within the jurisdiction of the court. *Graham* v. *State*, 1 Ark. 171; *Blackwell* v. *State*, 30 Tex. App. 416; *Augustine* v. *State*, 20 Texas, 450; *State* v. *Nolan*, 8 Rob. (La.) 517; 1 Bish. Dir. & Forms, § 80; 1 Bish. Cr. Pro. § 378. See also other cases cited in brief of appellant in which *at* was used in the sense of *in*, denoting acts to be performed within definite limits.

But, should we concede that *at* was used by the parties in the sense of *in*, which is the most that can be claimed for it under the proof, still it does not follow that it means "within the corporate limits." In *Bank of Owatonna* v. *Wilson*, 62 Ark. 143, this court said: "There may be towns that have overgrown their corporate limits." Generally, in speaking of a town as a mere place of geographical location, we have no reference whatever to the corporate limits, but simply use the name of the town as designating the aggregate body of people living in such considerable collection of dwelling houses and in such proximity as to constitute a town, as distinguished from the country. Stand. Dict., "Town." For instance, if the bishop did say, "We propose to locate a college *in* Searcy," no one would have

been justified in concluding, from that language alone, that he meant "within the corporate limits of Searcy," as contradistinguished from that part of the town lying beyond the corporate limits.   And it is shown that a large number of the inhabitants of the town dwelt beyond the corporate limits.   Such a proposition, however, coming from the committee of the church, would bind it to locate the college in the town of Searcy, and not in the country adjacent thereto.   In this view of the case, whether or not the college was located in the town or country is a question of fact, upon which the finding of the trial court will not be disturbed.

Second.   *It is contended "that there can be no recovery because Rogers withdrew his offer to subscribe."*   As soon as Rogers ascertained that the committee, who had been appointed to fix upon the situs for the college, would go beyond the corporate limits to look at locations, he notified members of that committee that they had no power to look at locations beyond the corporate limits, and he told Mr. Pipkin, who was a member of the committee of the conferences, that he would not "pay a cent" if the college was located out of town.   He notified the building committee to the same effect.   It may be said, properly, that these were the agencies left in charge by the church committee to carry on the work, in the absence of said committee, until the college should be duly organized and incorporated. So the notice that he did not intend to be bound by his subscription was sufficient.   But this notice was not given until after the Monday night meeting, when the subscription list was presented to the representatives of the church, and accepted by them, and the location of the college given to Searcy.   The contract between Mr. Rogers and the church, as stated, was closed that night.   The terms of the contract were that the church, for a valuable consideration moving from the citizens of Searcy, would locate, build, and maintain a college there, and that the subscribers, in consideration of the performance of these stipulations by the church, would pay to it certain amounts.

The rule, as announced by the best text writers and the best adjudications, is that a gratuitous subscription will be considered as only a continuing offer to make a gift, and until,

accepted by the promisee, and acted upon in such manner as to raise a consideration, it may be withdrawn.   1 Wharton, Cont. 528; Clark, Cont. 167; 1 Parsons, Cont. 541; Anson, Cont. § 73, note; 1 Beach, Cont. § 206; *Cottage St. M. E. Church* v. *Kendall*, 16 Am. Law Reg. (O. S.) 546; S. C. 121 Mass. 528; *Richelieu Hotel Co.* v. *Int. Mil. Encampment Co.*, 140 Ill. 248; *Grand Lodge I. O. G. T.* v. *Farnham*, 70 Cal. 158; *Baptist Church* v. *Cornell*, 117 N. Y. 601.   See also note of Judge Bennett to *Cottage St. M. E. Church* v. *Kendall*, 16 Am. L. Reg. (O. S.) *supra*, where cases on "subscriptions" are reviewed.

"Any benefit accruing to him who makes the promise, or any loss, trouble or disadvantage undergone by, or charge imposed upon him to whom it is made, is a sufficient consideration to sustain a promise." *Ex parte Hodges*, 24 Ark. 201; *Troy Academy* v. *Nelson*, 24 Vt. 189; *Amherst Academy* v. *Cowls*, 6 Pick. 427; *Barnes* v. *Perine*, 12 N. Y. 18, 25; *Cottage St. M. E. Church* v. *Kendall*, *supra*.

As soon as the subscription was accepted, the church entered upon the performance of her part of the contract by locating the college at Searcy.   This, too, was the most important part of the contract, for the church as well as the subscribers.   For it deprived the church of entertaining propositions of donation from other places in the state, however liberal and inviting they may have been, and by the act of locating the college the subscribers got all they were then asking. Furthermore, the church immediately constituted agencies, and put them to work to carry out, in good faith, her part of the contract; which these agencies were doing when Rogers concluded that he would not be bound by his subscription.

Moreover, this subscription was not an offering to charity, and it was something more than a mere subscription to a public purpose.   The presentation of the subscription list, under the circumstances, carried with it the request that the church locate the college at Searcy, and thus deny it to all other places. The granting of this request meant the expenditure of thousands of dollars by the church, and the bestowment upon the subscribers of a real benefit.   *Philomath College* v. *Hartless*, 25 Am. Rep. 511.   In *Williams* v. *Rogan*, 59 Texas, 438, the court said:   " 'This is not an ordinary case of a subscription

to some charitable or public purpose in which there are no contracting parties except the subscribers. But the subscribers are the parties upon one side, and the district conference the party upon the other side. Upon the acceptance of the proposition of the conference, the subscribers became bound, as did the conference upon its acceptance of the subscription and agreement to build in accordance with the terms of the subscription. There was then a mutuality of agreement, so that each party had the right to hold the other to a binding agreement, and it became so previous to or even without the performance." There is ample warrant in the law, under the facts of this case, for holding Rogers to his subscription, without going to the extent of the Texas court, though there is a strong line of cases supporting this doctrine. *Collier* v. *Baptist Ed. Society*, 8 B. Mon. 68; *Troy Academy* v. *Nelson*, 24 Vt. 194; *Ladies Collegiate Inst.* v. *French*, 16 Gray, 196 (and cases cited;) *Trustees* v. *Ripley*, 6 Gr. (Me.) 382; Anson, Cont. p. 94, note " Subscriptions."

Third. *Was the subscription of Rogers upon condition that there should be a full subscription of $25,000? and, if so, was the condition fulfilled?*

Bishop Galloway, speaking, presumably, for the church committee, required a bonus or subscription of $25,000 as a condition precedent to the location of the college at Searcy. The church, under this proposition, was not bound to locate the college until said amount was subscribed, and upon the authority of *Turner* v. *Baker*, 30 Ark. 186, neither were the subscribers (unless for other reasons); for the stipulations of the contract, when entered upon, had to be mutually binding upon the respective parties, to constitute a valid consideration. *Were the $25,000 subscribed?* A subscription list showing that said amount had been subscribed was presented to the committee. True, it contained the names of Wilburn and Greer, who, it is said, were not *bona fide* subscribers of the amounts named for each, and that, even reckoning these, the list lacked $364 of the necessary amount. Greer's subscription was authorized by him; Wilburn's was not. However, the list shows the names of six gentlemen "who gave a written guaranty of balance, $364." When it was

ascertained that Wilburn's subscription for $1,000 was not authorized by him, the six gentlemen who had guarantied the balance held themselves bound, under the terms of their agreement, to make this good, and did so. They were the parties to the agreement "to make up the balance," and must have understood what that meant better than any one else. In the absence of any showing to the contrary, we think their construction of what they were required to do "to make up the balance" (although $364 was expressly named) should be taken as the true state of the case. Therefore, a finding that $25,000 were subscribed would not be clearly against the preponderance of the evidence.

But, should we be mistaken in this, still, the contention could not avail Rogers; for, so long as the doctrine of estoppel *in pais* retains its potency in a court of conscience, one will not be heard to deny the existence of a certain state of facts which he, either in express terms or by conduct, represented as existing, and which he intended to be acted upon by another in a certain way, and which was so acted upon in good faith by the other, to his detriment. *Carr* v. *Ry. Co.*, 10 Law Rep. (C. P.) 307; *Seton* v. *Lafone*, 19 Q. B. D. 68, 70; *Troy Academy* v. *Nelson, supra;* 2 Herman, Est. §§ 759–764.

"The getting up of the subscription was the business of the citizens." The business of the church committee was to locate the college. In the work of "getting up" and perfecting the subscription list, Rogers took a prominent part. He knew, or should have known (being present), how the alleged subscriptions of Wilburn and Greer were taken; that the former was by the daughters of Wilburn, and the latter through Mr. Pipkin. At the Monday afternoon meeting he made no objection to, and no inquiry concerning, the two subscriptions now called in question. But, on the contrary, so well satisfied was he that the list met the requirements of the committee as to the $25,000, and that it would be accepted, that he joined in a request to the bishop to appoint a committee on the location of the college site, and himself proposed how that committee should be constituted. The church committee, some of whom were present at all the meetings, could not have failed to observe that Rogers was a leading spirit in

the enterprise.    When Professor Rives, representing Rogers and all the subscribers, presented the list as a subscription list for $25,000, the church committee had the right to reply upon this representation.    There was nothing to give notice that the subscribers present were not acting in the utmost good faith. Rogers was a resident, knew the subscribers, and knew what the committee demanded.    The committee " took the subscribers at their word," so to speak, accepted the list as a subscription for $25,000 and located the college at Searcy, expending thousands of dollars more than the subscription of $25,000 in its erection and equipment.    But that Rogers got what he asked would be enough, under the circumstances, to sweep him from any standing in a court of equity on this contention.

Fourth.    *Is the subscription of Rogers "void because the condition that four persons should subscribe $2,500 each was not complied with?"*

It is claimed that G. B. Greer was not a *bona fide* subscriber for $2,500.    Rogers proposed to be one of four to subscribe $2,500 each.    This was not a condition imposed by the church, but Rogers had the right to, and did, make it a condition for binding him.    Greer authorized Pipkin to enter his name upon the subscription list for $2,500.    This was done the 26th day of February, 1888.    Pipkin says that he told Greer "that the whole matter was hanging on his [Greer's] decision; that if he would pay the $2,500, the institution would be located at Searcy, and that Greer said 'he would not let it fail; to go and put him down for $2,500.' "    Pipkin further says: "I told him, as a gentleman, that if he would pay the $2,500, and save the institution, I would do what I could to help him.    Nothing was said about any note or release in any respect from the $2,500," and at that time no amount was mentioned.    This is uncontradicted.    About one month after this (March 26th) Greer executed his note to cover the subscription, and he says "that he did it upon condition that he was to be one of four to make up $10,000, with the understanding that $1,500 was to be collected and paid by Mr. Pipkin and Mr. Jeffett as a credit on his note.    They were to canvass the state, and get it.    He says he was willing to subscribe only $1,000, and that the note was executed for $2,500 in order to bind the

other three who had subscribed $2,500 each; that Pipkin signed the note as chairman of the board, and that Yarnell and himself, who were on the board, signed it. Yarnell was away, and he (Greer) signed his (Yarnell's) name, having authority to do so." The paper spoken of by Greer as the "note" is as follows: "Received of G. B. Greer fifteen hundred dollars, to be applied to his subscription to the Galloway Female College for twenty-five hundred dollars when collected. (Signed) E. M. Pipkin, President of Board, A. W. Yarnell, G. B. Greer, of Board." Pipkin says that he never thought of this being considered a release of Greer on his subscription for $2,500; that it was not so intended. Yarnell denied that Greer had any authority to sign his name. It is sufficient to say of this so-called release that the proof does not justify the conclusion that it was designed as a release *pro tanto* of Greer's subscription. But if it were so intended, it could not have that effect. Pipkin neither as "president of the board" nor as a private individual had authority to release any of the subscribers from their subscriptions. The authority which the building committee had in the premises, or Pipkin acting for it and the church, was not to release, but to collect, what had been subscribed. Greer's name was, by his authority, put upon the subscription list. Any private understanding he might have had with Pipkin that he (Greer) was not to pay but $1,000, even if such were the fact, could not operate to defeat his subscription, or that of any other subscriber. This so-called release was not taken until a month after Greer's contract with the church had been closed. Pipkin was not representing the church committee when he was soliciting Greer's subscription, nor when Greer instructed him to put his name on the list. Pipkin's commendable energy and enthusiasm may have led him to make promises on his own behalf which he could not carry out. But, if so, for this the church was in no wise responsible. Moreover, Greer's subscription for $2,500 has been fully paid; which speaks for itself as to whether or not Greer considered himself bound by it.

Where a specific sum is to be raised, and confidential subscriptions are taken from some, not intended to be collected, in order to induce others to subscribe, such fictitious or honorary

subscriptions would be a fraud upon the other subscribers, and the latter would not be liable unless, after deducting the bogus subscriptions, the required sum had been raised. 1 Wharton, Cont. 529; 1 Pars. Cont. *454; *Blodgett* v. *Morrill*, 20 Vt. 509; *N. Y. Exch. Co.* v. *Dewolf*, 31 N. Y. 273. But the conduct of the church committee was free from fraud and dissimulation throughout the whole transaction.

Again, since this condition was imposed by Rogers, who knew that Greer's subscription was put down by Pipkin, and that it was the last of the four for $2,500, and since Rogers made no inquiries about it, and was a party to the presentation of the list in that form to the church committee, thereby representing that same met the requirements of said committee for the location of the college; and since the offering of that list, under the circumstances, could be construed as nothing less than a request from the subscribers for the location of the college, as the committee granted this request, which could not now be undone without irreparable loss to the church and college, the subscribers must not be heard to complain. The church is not complaining of Greer's subscription, Greer is not complaining, and Rogers' complaint on this score is unavailing.

Fifth. The last contention, *"that there can be no recovery upon the original subscription,"* is not well taken.

1. Even if the original contract had merged in the note, as is insisted, still the note would be binding, for reasons already shown. But, without an original contract of subscription, there could be no recovery at all; and this, as stated *supra*, was entered into between the church and Rogers Monday night, February 27, 1888. Although an offer to subscribe was made by Rogers the day before, it did not become binding until the conditions imposed were fully met by the parties and the contract closed. Nothing was done, or could have been done, after that, without the assent of both Rogers and the church, to alter the terms of the contract. The agencies representing the church committee had no authority to vary the terms of the contract. They were constituted for the express purpose of enforcing it as made. If, as appellant argues, the oral or original contract merged in the note, and no parol evidence is admissible to vary its terms, what becomes of the conditions that

$25,000 were to be subscribed, and that four persons were to subscribe $2,500 each, etc.? The note is as follows: "On consideration of the location, erection and operation by the Methodist Episcopal Church for the State of Arkansas of the state female college of said church in Searcy, Ark., I hereby agree to pay on demand to the building committee to be appointed by said church the sum of $2,500." The only conditions prescribed by this instrument are the "location, erection and operation by the Methodist Episcopal Church of the state female college of said church in Searcy, Arkansas." That the college has been located, erected and operated is conceded, and Rogers only complains that it was not located "within the corporate limits of Searcy," and that the other conditions, *supra*, were not complied with. But, none of these being mentioned in the note, if it alone is to be considered as the contract and the basis of the suit, then Rogers' "last estate is worse than his first," for he could only defeat payment of the note by showing that the conditions therein contained had not been complied with. Under this view, necessarily, various other contentions would pass out. The pleadings and proof show that suit was grounded upon the original contract of subscription entered upon at the time mentioned above.

2. The solemn admission of appellant "that the Galloway Female College, as now incorporated, is the institution which was established pursuant to the subscriptions and proposition of Bishop Galloway February 26 and 27, 1888," answers his contention as to the want of proper parties. The college is the beneficiary of that subscription. It stands *in loco ecclesiæ*, as to the right to sue upon it. *Chamblee* v. *McKenzie*, 31 Ark. 155; *Talbot* v. *Wilkins*, *ib.* 411; *Hecht* v. *Caughron*, 46 *ib.* 132; *Benjamin* v. *Birmingham*, 50 *ib.* 433; Sand. & H. Dig., § 5623. See, also, *Johnson* v. *Ewing Female University*, 35 Ill. 518; *Snell* v. *Trustees*, 58 Ill. 290.

Upon a careful consideration of this large record, assisted, as we have been, by learned and exhaustive briefs of counsel, we conclude that there is no equity in the answer to the complaint. The church has faithfully performed her part of the contract. She has planted at the town of Searcy an excellent institution of learning, valued at $60,000, which has been

creditably maintained and sustained by the great body of Methodists in the state. Mr. Rogers "forged to the fore" in the movement which secured this college for his town, his con- duct doubtless causing many of his fellow citizens to subscribe so liberally towards the enterprise. They, like him, have shared the benefits, but, unlike him, they have also borne the burdens. It would have been a praiseworthy expenditure of capital and energy on the part of Mr. Rogers, even though bottomed on the conditions disclosed in his answer. But, unfortunately for him, as to whether or not these conditions existed, and had been complied with, are mainly questions. of fact, upon which the ruling of the learned chancellor was adverse to him, and the record shows full warrant for his finding. Nor have we discovered any misapprehension of the law applicable to such cases. The decree is therefore in all things affirmed.

BATTLE, J., (dissenting.) As to the facts in this case, my conclusion is as follows: A proposition was made to the peo- ple of Searcy to locate a female college of the Methodist church of the state of Arkansas at Searcy, if any number of them would subscribe, in the aggregate, the sum of $25,000 for that purpose. On that condition, and the further condition that three other citizens of Searcy would each subscribe a like amount, and thereby make the total amount of the subscriptions of himself and the three others $10,000, Thomas J. Rogers subscribed the sum of $2,500. He thereafter executed the memorandum sued on, by which he agreed to pay this amount on demand to the build- ing committee to be appointed by the Methodist church. Many other citizens of Searcy subscribed liberally for the same purpose, and several non-residents subscribed, whose subscriptions were added to their list; but, in order to make the subscriptions of all of them (including the non-residents added to the list) amount to $25,000, or the subscriptions of any four of them amount to $10,000, the amount said to have been subscribed by G. B. Greer was necessary. He ostensibly subscribed and gave his note for $2,500, but with the secret understanding and agree- ment that he would contribute only $1,000; it being under- stood that $1,500 should be collected by subscription from other sources, and credited on his note and subscription. He, however, afterwards agreed to, and did, pay about $2,500 with-

out the benefit of the credit he was to receive.    Before he decided to do so, Rogers declined to pay his subscription unless the college was located within the corporate limits of Searcy, and gave sufficient notice in due time that he would not do so, except on the condition named, which was never performed.

'    Acccording to the facts before stated, Rogers is not bound to pay his subscription.    *Turner* v. *Baker*, 30 Ark. 186; *Stewart* v. *Second Presbyterian Church*, 84 Pa. St. 388; 1 Beach, Contracts, § 40; 1 Wharton, Contracts, § 529; 1 Parsons, Contracts (8 Ed.), star page 454.

I think the decree of the chancery court should be reversed, and the complaint dismissed.