WESLEYAN UNIVERSITY *v.* CHESTER R. HUBBARD, *Admr., etc., et al.*

(No. 9292)

Submitted April 21, 1942. Decided June 2, 1942.

Rose, Judge, and Fox, President, dissenting.

*W. C. Grimes, Edmund Lee Jones, Schmidt, Hugus & Laas* and *McCamic & Clarke,* for appellants.
*Ralph L. Miller,* for Wesleyan University, appellee.

KENNA, JUDGE:

This proceeding was instituted in the Circuit Court of Ohio County by Wesleyan University, a Connecticut corporation, in its own behalf and in behalf of all other creditors of the Estate of W. P. Hubbard, deceased, for the purpose of subjecting to the payment of an indebtedness alleged to be due and unpaid to the complainant, evidenced by a demand collateral note for forty-three thousand dollars, dated January 1, 1928, and signed by Nelson C. Hubbard and Alma R. Hubbard, the then executors of the estate of W. P. Hubbard, deceased, which note in turn was given to cover the unpaid semi-annual installments of a written pledge of eighty-nine thousand dollars made by W. P. Hubbard in his lifetime on April 12, 1920, for the purpose of endowing a chair of economics and social science to be dedicated to the name of his father, Chester D. Hubbard, certain property known as "Forest Home" situated in Triadelphia District of Ohio County of which it is alleged W. P. Hubbard died seized

and possessed. The decree of the circuit court allowed the complainant a partial recovery, and the defendant creditors of Alma R. Hubbard, to whom "Forest Home" was specifically devised, were granted this appeal.

According to the allegations of the bill of complaint, W. P. Hubbard died testate on the fifth day of December, 1921, specifically devising the property known as "Forest Home" to his daughter, Alma R. Hubbard, who in turn died testate and unmarried on the sixth day of January, 1932.

The Keystone National Bank of Pittsburgh and other creditors of Alma R. Hubbard brought a proceeding in the Circuit Court of Ohio County against her executor and others for the purpose of settling her estate, and on the twelfth day of November, 1937, a decree of sale was therein entered, which included "Forest Home" as a part of the property of which Alma R. Hubbard died seized and possessed. The bill of complaint herein, which was filed in open court December 2, 1937, also sought an ancillary injunction directed to the special commissioners named in the decree of sale in what may for convenience be called the "Keystone" case therein entered on November 12, 1937, and a statement of the accounts of Nelson C. Hubbard, co-executor of the estate of W. P. Hubbard, who had died and been succeeded by Chester R. Hubbard as administrator d. b. n.

After exhaustive demurrers to the bill of complaint were overruled, answers were filed by the creditors of Alma R. Hubbard, parties in the "Keystone" cause, and, after proof taken, a decree was entered in favor of the complainant which disregarded the collateral note for forty-three thousand dollars made by the executors on January 1, 1928, restricted the amount of the recovery to that of the last semi-annual payment of sixty-five hundred dollars due under decedent's pledge December 1, 1927, with interest from that date, and ordered "Forest Home" sold as property subject to the indebtedness of W. P. Hubbard.

There are numerous integrated issues shown of record in this matter, but the core of the controversy admittedly

is the question of whether the highly valuable Hubbard residential property known as "Forest Home" is to be subjected to the indebtedness of the estate of Alma R. Hubbard, who, as the specific devisee of her father, occupied it from the time of his death in 1921 until she died in 1932, and in good faith incurred substantial indebtedness under the belief of her ownership and control, her creditors having neither actual nor constructive notice to the contrary, or is to be applied to the debts of W. P. Hubbard, whose estate, though his death occurred in 1921, has not yet been settled and who was unquestionably solvent at the time of his death, his estate having been appraised at an aggregate value of a little less than two million dollars, and that part of his indebtedness not involved in this proceeding having been practically negligible and promptly satisfied by his executors.

There are two major questions to be disposed of before the other assignments of error can be reached. These are: (a) The nature of the obligation, to the payment of which the real estate of a decedent may be subjected, and (b) whether the claim upon which recovery is sought in this matter as described in the bill of complaint falls within that class.

The debts of a decedent at common law do not constitute a charge upon his real estate. We must, then, look to our statutes for the principles upon which the decision of this matter rests.

If the assets in the hands of the personal representative, i. e. personal property, prove to be insufficient to discharge all of the just claims against the estate, they are to be applied in the order prescribed in Code, 44-2-21, subsection eight covering "voluntary obligations." The balance remaining unpaid after such assets have been administered in the manner prescribed is, by Code, 44-8-3, made a charge upon the decedent's real estate provided they fall within the definition of "debts" or "lawful demands against his estate." There can be no doubt that debts and lawful demands are exclusive of other than legal obligations, the first being for a definite amount and

the term lawful demand embracing unliquidated obligations.

Viewing these two sections together, we believe that it is unnecessary to say more than that, in our opinion, the language of neither section was intended by the law-making body to extend the obligations of a decedent's estate so that they would include as binding, matters that, had the decedent lived, would be payable only subject to his election: Such a policy would be in direct conflict with the well established general policy of the legislature and of the courts to accord to the property of a decedent the full protection of the law. Neither section of the statute renders enforceable against the estate of a decedent an "obligation" not legally enforceable against a living party thereto. All other provable obligations constitute valid charges against such estate.

The next query, then, is whether this "pledge," so-called, in fact did constitute a legally enforceable contract entered into between W. P. Hubbard and Wesleyan University either at the time the pledge was signed and delivered or, treating that act as a continuing offer by W. P. Hubbard, became irrevocable when Wesleyan University entered upon its performance.

The question of whether charitable subscriptions or voluntary pledges are enforceable at law is extremely involved and rather abstract, it being the tendency of the courts to sustain the enforceability of subscriptions of that nature as being based upon a valid consideration, not on the ground of maintainable legal reasoning, but rather on the general ground of public policy, even though the legislative bodies seem to have failed to respond to that policy, plainly discernible by the courts. The legal distinctions drawn are abstractly fine and cannot be adequately dealt with in an opinion of limited length, but as a source of reference, see 25 R. C. L. 1396; 1 Williston on Contracts (Rev. Ed.) 403, and "The Problem of Consideration in Charitable Subscriptions," by Thomas Clifford Billig in Selected Reading on The Law of Contracts, at page 542.

We are of the opinion that the attitude of this Court to the extent of holding that subscriptions or pledges not

based upon a common law consideration, either of benefit to the promisor or of detriment to the promisee, are unenforceable has already been determined by the case of *Banner Window Glass Co. v. Barriat*, 85 W. Va. 750, 102 S. E. 726. In that case, two brothers, Fernand and Henry Barriat, had agreed in writing to pay to their father and mother, and to the survivor, all dividends thereafter paid upon their equal holdings in the window glass company stock. The paper signed by them was turned over to the father, and by him delivered to the window glass company and in compliance with its terms, dividends were paid to the father until the date of his death, and thereafter, for a time, paid to the mother. In 1918, the glass company disposed of its property for the sum of sixty-five thousand dollars and went out of business. At that time, it had also an earned surplus of sixty-five thousand dollars on hand. A contest arose between Henry Barriat and the mother as to which was entitled to the pro rata part of the earned income that the window glass company intended to disburse as a dividend, Henry having directed them to pay no part of it to his mother. This Court held the agreement unenforceable, saying, in substance, that in order for an agreement to be enforceable as based upon a valuable consideration, it is essential that it be based upon a common law consideration moving vertically as between the promisor and promisee as the agreement moved, and not laterally as between promisors, in order to bind them mutually to perform for the benefit of the promisee from whom no consideration moves. The second syllabus point in the *Barriat* case reads as follows:

> "The promise of a party to a contract, in order to be a good consideration for the undertaking of the other party thereto, must be such as to impose a legal liability. Where the promise relied upon as constituting the consideration for the contract does not impose any legal liability upon the promisor, it will not ordinarily be held to be a sufficient consideration for the undertaking on the part of the other party."

Omitting only the dates and amounts of payments as

therein set forth, the pledge signed by W. P. Hubbard in April, 1920, reads as follows:

> "In consideration of contributions and gifts to be made by others to the endowment and equipment funds of Wesleyan University, Middletown, Conn., I hereby agree to give to the trustees of said University, five thousand dollars. * * * which gifts will aggregate eighty-nine thousand dollars. ($89,000)
>
> These gifts are to be applied toward the endowment, in the name of Chester D. Hubbard, of the Chair of Economics and Social Science in the University."

It will be noted that the signer promises to "give" to the trustees of the university, and that the recital of the consideration, or reason for his gift, refers to contributions and gifts to be made by others, while a present consideration in hand is not mentioned. There is no allegation in the bill of complaint nor is there proof in the record indicating that other gifts were thereafter made "to the endowment and equipment funds of Wesleyan University" which could in any way be taken as a compliance with the recital of consideration to be received by W. P. Hubbard, admitting that the terms specifying no amount of the other subscriptions, no time limit for their procurement and no specific fund into which they were to go, are definite enough to constitute a binding obligation.

In dealing with the matter of consideration, the trial chancellor in what may be regarded as his final written opinion concerning the merits, made a part of the record, says this:

> "Accordingly, on the matter of consideration we are here sent to the matter of other subscriptions. It would seem to the court that the recital in the pledge itself raises the presumption that there were other subscriptions. That presumption is not rebutted. However, the word 'seem' is used advisedly. This conclusion has been reached from a review of the many cases cited by counsel and found in the A. L. R. notes. It would seem clear

that the Canadian doctrine would not go this far. It likewise seems clear that the American doctrine will. While it seems clear, it is not perfectly clear and we have no direct local authority on it. It is rather taken for granted that this is a mere formality at best—that the other subscriptions can be shown. Accordingly, while this is the tentative holding of the court, counsel may be heard further on this question particularly if there is a real desire to take testimony thereon."

We cannot agree with the chancellor that the recital in the pledge creates a presumption of other future subscriptions. The pledge makes no reference to past nor to simultaneous pledges. Wesleyan University is not shown to have altered its position in the least due to the pledge of W. P. Hubbard; it created no Chair of Economics and Social Science, incurred no obligations, made no expenditures, suffered no detriment, and parted with nothing. We are of the opinion that it was only a continuing offer to become legally bound to pay, if and when the trustees procure further pledges, and, although the trial chancellor accorded counsel every opportunity to strengthen his case in that regard, that evidently could not be done.

Based upon the foregoing discussion, the decree of the trial chancellor will be reversed and the cause remanded to be proceeded in further in accord with the views herein expressed, granting leave to amend the bill of complaint and if the complainant declines to do so, sustaining the demurrers thereto and dismissing the cause. The other assignments of error not being reached, it is unnecessary to discuss them.

*Reversed and remanded.*

Rose, Judge, dissenting:

I cannot subscribe to the conclusions of law reached by the majority of the Court, and, in view of the great number, and vast magnitude, of public enterprises of highest merit which originate in, and depend upon, contributions in the form of subscriptions, I believe a record of my dissent is justified.

Unfortunately, we have little aid from counsel on the question of the binding character of this subscription. Evidently this question was not emphasized in the trial court. The case seems to have been handled below as though the validity of the subscription was, for practical purposes, not controverted. In the brief here on behalf of the appellees, the question is not even referred to, while the brief of appellants does little more than casually speak of the subscription as a voluntary obligation or a *nudum pactum*. In oral argument, the question was only incidentally touched.

The legal quality of such subscriptions has often been appraised by the courts, particularly of those of the older and wealthier states. Certain general principles have been evolved and accepted. A subscription, or promise to donate must be based upon a legal consideration if it is to be binding. *Irwin* v. *Lombard University,* 56 Ohio State 9, 46 N. E. 63, 36 L. R. A. 239, 60 Am. St. Rep. 727; *Allegheny College* v. *National Chautauqua County Bank,* 246 N. Y. 369, 159 N. E. 173, 57 A. L. R. 980; *Trustees, etc., College at La Grange* v. *Parker,* 198 Mo. App. 372, 200 S. W. 663; *Montpelier Seminary* v. *Smith's Estate,* 69 Vt. 382, 38 A. 66; *Phillips Limerick Academy* v. *Davis,* 11 Mass. 113, 6 Am. Dec. 162; *Grand Lodge, etc.,* v. *Farnham,* 70 Cal. 158, 11 P. 592; *New Jersey, etc. Dispensary* v. *Wright,* 95 N. J. L. 462, 113 A. 144. Some highly influential courts frankly state that they incline toward the validity of such promises wherever such holding is at all possible, and are vigilant to find a consideration which may, on any theory, be treated as sufficient, though it might not be adequate in a purely commercial transaction. *Allegheny College* v. *National Chautauqua County Bank, supra; Gittings* v. *Mayhew,* 6 Md. 113; *Irwin* v. *Lombard University, supra.*

Various factors have been held sufficient by way of consideration to make the subscription legally binding. Work done, money expended, or liability incurred by the beneficiary on the faith of the subscription very generally makes the agreement binding. Typical cases so holding are: *Miller* v. *Western College of Toledo,* 177 Ill. 280, 52

N. E. 432, 42 L. R. A. 797, 69 Am. St. Rep. 242; *Y. M. C. A.* v. *Estill,* 140 Ga. 291, 78 S. E. 1075, 48 L. R. A. (N. S.) 783, Ann. Cas. 1914D, 136; *Rogers* v. *Galloway Female College,* 64 Ark. 627, 44 S. W. 454, 39 L. R. A. 636; *Des Moines University* v. *Livingston,* 65 Iowa 202, 21 N. W. 564; *Athol Music Hall Co.* v. *Carey,* 116 Mass. 471; *Albert Lea College* v. *Brown,* 88 Minn. 524, 93 N. W. 672, 60 L. R. A. 870; *Barnes* v. *Perine,* 12 N. Y. 18; *Baptist Female University* v. *Borden,* 132 N. C. 476, 44 S. E. 47, 1007; *Trustees of University of Pennsylvania* v. *Cadwalader,* 277 Pa. 512, 517, 121 A. 314. Mutual subscriptions are sufficient to support each other. *Albany Presb. Church* v. *Cooper,* 112 N. Y. 517, 20 N. E. 352, 3 **L.** R. A. 468, 8 Am. St. Rep. 767; *Culver* v. *Banning,* 19 Minn. 303; *Cottage Street M. E. Church* v. *Kendall,* 121 Mass. 528, 23 Am. Rep. 286. The benefit to the subscriber in common with the public in general, has been treated as a sufficient consideration to make a subscription enforceable. *Comstock* v. *Howd,* 15 Mich. 237; *Pitt* v. *Gentle,* 49 Mo. 74; *Detroit First Universalist Church* v. *Pungs,* 126 Mich. 670, 86 N. W. 235; *First M. E. Church* v. *Howard's Estate,* 133 Misc. 723, 233 N. Y. S. 451; *Miller* v. *Ogelthorpe University,* 24 Ga. App. 388, 100 S. E. 784. The implied obligation of the beneficiary to preserve, apply and use the donated fund for the designated purposes has been held to be sufficiently a burden or detriment to the beneficiary to constitute a consideration to make the subscription binding. *Trustees Kentucky Female Orphan School* v. *Fleming,* 10 Bush (Ky.) 234; *Fryeburg Parsonage Fund* v. *Ripley,* 6 Greenl. 442, 6 Me. 442; *Williams College* v. *Danforth,* 12 Pick. (Mass.) 541; *Ladies' Collegiate Inst.* v. *French et al.,* 16 Gray (Mass.) 196; *Farmers' College* v. *Executors, etc., of McMicken,* 2 Disney (Ohio) 495; *Detroit First Univ. Church* v. *Pungs,* 126 Mich. 670, 86 N. W. 235.

I believe that, in the instant case, the subscription of William P. Hubbard is shown by the record to be sufficiently supported by other like subscriptions. Nelson C. Hubbard made a subscription of $11,000.00 to the same fund on the same day, and has paid it in full. Defendants

introduced a letter from the treasurer of the University stating that a total of about $950,000.00 had been collected on subscriptions. No other direct evidence appears on the question. Indeed, it seems not to have been questioned below that other subscriptions were made and paid. This evidence, in the absence of any dispute, may be taken as sufficient to justify the court in proceeding on the basis that there were other subscriptions, by which the Hubbard subscription became a binding contract.

Another aspect of the case compels the same conclusion. The University, by accepting the subscription and the installments thereof which were paid by William P. Hubbard in his lifetime, became obligated to care for and preserve the funds received, and to collect the residue, and, when the fund should be complete, to maintain and use it in perpetuity for an agreed purpose. The gift thus became a benefit to the University, of course. But it also became a burden and an obligation—a detriment to the extent of the obligation and duties assumed. This detriment and burden to the beneficiary was a sufficient consideration from its standpoint to create a valid contract between it and the subscriber. In *Trustees Kentucky, etc., School* v. *Fleming,* 10 Bush (Ky.) 234, the Court said: "A promissory note given for a donation intended to be made to a charitable institution is obligatory where its trustees are authorized by its charter to receive such donation, and are required to apply the fund to the charitable purpose of the institution; this obligation on their part being a sufficient consideration to uphold the promise to pay." The Supreme Court of Michigan, in *Detroit First Universalist Church* v. *Pungs,* 126 Mich. 670, 86 N. W. 235, decided that: "A promise to contribute to a fund for the purchase of a church site is based on a valuable consideration, of implied benefit to the subscriber, and is a valid, enforceable contract." A like conclusion was reached in *Fryeburg Parsonage Fund, etc.* v. *Ripley,* 6 Greenl. 442, 6 Me. 442, wherein it was announced that: "Where divers persons subscribed to a fund for the support of public worship, promising to pay to the trus-

tees of the parish funds the sums subscribed, on condition that the trustees should manage the fund in a certain manner, and apply the income thereof to the support of a congregational minister, and to the payment of the parish taxes which might be assessed on the subscribers;—it was *held* that the promise was binding on the subscribers; the acceptance of it on the conditions prescribed, being an engagement on the part of the trustees to perform those conditions."

If the highly logical principle thus promulgated by these and other courts is sound, there was a perfect contract between William P. Hubbard and Wesleyan University from the time his offer was accepted by the University, which acceptance is confirmed by the payments made and accepted in the donor's lifetime. Forthwith he was bound to make the payments stipulated for, and the University was equally bound to receive, care for, preserve and use the fund as prescribed. This arrangement did not constitute a *nudum pactum*.

Still a third viewpoint confirms this conclusion. William P. Hubbard's subscription was not an ordinary subscription. It was an agreement to pay the University the sum of $89,000.00 in consideration of which a memorial to his father, Chester D. Hubbard, was to be established and maintained by the University. In this sense the offer was not at all to make a donation. Hubbard was to receive for his money a thing personally and peculiarly valuable to him individually. The proposed memorial differs not at all in legal aspect from a physical monument to his father. Suppose the proposition had been that the University for $89,000.00 had agreed to erect a statue, a tower, a fountain, or a carillon in memory of Chester D. Hubbard and that the offer had been legally accepted. Would there then be any doubt that an enforceable contract would have resulted from such an agreement? Why does not the agreement of the University to establish a memorial to William P. Hubbard's father in the form of a chair of economics bearing the father's name amount to a binding contract as completely as though the memorial had been a physical monument?

Of course, since the chair was to be established by the very funds from the Hubbard subscription, it could not be set up until the subscription was paid, and hence, performance by the University was not a prerequisite to this suit.

The record would seem to require, however, that the cause be remanded for the reason that no marshalling of the assets of William P. Hubbard's estate has ever been made, although other free assets, particularly cash coming into the hands of the executors pending this suit, appear to be available and applicable on the Wesleyan claim, and are apparently sufficient to discharge it in full. I, therefore, would reverse and remand for this purpose.

Judge Fox authorizes me to say that he joins in this note.