BYINGTON *v.* LITTLE ROCK CHAMBER OF COMMERCE.

Opinion delivered February 4, 1918.

CONTRACTS—SUBSCRIPTION TO VOLUNTARY PUBLIC ORGANIZATION—PURCHASE OF LAND—STATUTE OF FRAUDS.—The Little Rock Chamber of Commerce, as a part of its scheme for the development of Little Rock, took deeds to certain lands, and also took money subscriptions from appellant and others, the plan being that, in con-

sideration of appellant's and others' subscriptions, which amounted to a definite sum, the Chamber of Commerce agreed to deed a parcel of land to the subscriber; the subscriber had the right to choose a parcel to be deeded to him, and if he neglected to do so, the Chamber of Commerce reserved the right to set apart to him a parcel of land which it should select. Appellant became a subscriber, but refused to pay his subscription or to select a parcel of land. The Chamber of Commerce set apart a lot of land for him, and sued for the amount of appellant's subscription. Appellant plead the statute of frauds. *Held,* the statute of frauds was not applicable, and that the Chamber of Commerce, under the facts, could maintain its action, and recover from appellant the amount of his subscription.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; affirmed.

*Marshall & Coffman, J. A. Comer* and *Manning, Emerson & Donham,* for appellant.

1. The demurrer should have been sustained. This was merely a suit not based upon a contract to enforce specific performance but to enforce a contract which appellant *did not enter into but which he contracted to enter into.* It is clearly against the statute of frauds. Kirby's Digest, § 3654. There was no meeting of minds. 21 Ark. 502.

The terms can not be ascertained without resort to extrinsic evidence. 45 Ark. 17. The contract was uncertain and indefinite. 76 Ark. 237. The lands were not described. 85 *Id.* 1; 106 *Id.* 83; 119 *Id.* 301; 2 Kent, Com. 511; 6 R. C. L. 38; 54 So. 953. See also 56 Atl. 742; 86 N. W. 1082; 48 So. 363; 25 *Id.* 709; 55 *Id.* 102; 106 Pac. 839. The court erred in overruling the motion to make the complaint more specific and in overruling the demurrer.

*W. B. Smith* and *John P. Streepey,* for appellee.

1. The demurrer was properly overruled. The statute of frauds was no bar. 36 L. R. A. (N. S.) 154. Proof was admissible to make the contract certain. 1 Elliott on Cont., § 179; 2 L. R. A. (N. S.) 210; 67 N. E. 340; 9 Dec.,

§ 110; 28 N. E. 227; 145 S. W. 377, 383; 97 N. E. 96; 43 *Id.* 35; 114 Ark. 436-9.

2.   The cases cited by appellant are not in point. The execution of the formal contract took the case out of the statute of frauds.   102 Ark. 377, 386.   The statute has no application to the facts here.   48 L. R. A. (N. S.) 783, 790; 64 Ark. 627-637; 47 N. E. 649.   See also 113 Ark. 439; 120 *Id.* 426.

3.   The promise of a subscriber is a sufficient consideration.   97 N. E. 958-961; Ann. Cas. 1913 (B), 238; 49 Cal. 347; 32 Conn. 412; 78 S. W. 435; 13 Mo. App. 7; 17 Am. Dec. 446; 2 Denio (N. Y.), 403; 5 Harr. (Del.), 346; 68 N. E. 320-326.

McCULLOCH, C. J.   This case was disposed of below on demurrer to the complaint of appellee, and the only question presented here is whether or not the facts stated in the complaint constituted a cause of action. The facts set forth in the complaint are in substance as follows:

The Little Rock Chamber of Commerce is a corporation organized by citizens of the city of Little Rock for the purpose, as its name implies, of promoting the business interests of the city, and among other things of encouraging public improvements of all kinds and particularly to secure the location of factories and other business enterprises in the city and vicinity.   One of the by-laws provides for the creation of a committee called the "Industrial and Development Committee" to have control of the disposition of development and industrial funds raised by the Chamber of Commerce and with authority to receive and distribute donations made for that purpose.   In the year 1911 a plan was devised for raising a large sum of money, not less than $200,000, to use in securing the location of factories and other business enterprises, and the plan contemplated securing from the real estate owners of the city and vicinity donations of real estate of $200,000 estimated enhanced value in five years by reason of the location of the industries to be thus

secured, and also securing subscriptions in money from those who were willing to become the purchasers of the' real estate thus donated at prices corresponding with said estimates of the enhanced value. Public appeals were made to citizens of Little Rock for donations of land and subscriptions of money upon the assumption that the proper use of the funds thus raised for the development of factories and other enterprises would, during the period of five years, result in substantial enhancement of values of real estate to the extent that owners of real estate would secure the enhancement in value on their lands sufficient to compensate for the donations made by them, and that the subscribers who were to receive the real estate at valuations based on the estimated enhancement during said period would secure, by way of profit on the investment, sufficient compensation to reimburse them for the amount subscribed. The plan was carried out and donations of lands were obtained in excess of the amount named and subscriptions of money on the terms stated above were obtained in excess of the said sum. There were printed blanks for the two classes of subscribers, the one used by the donors of lands provided that in consideration of $1 and the benefits to accrue from the expenditure of the funds thus raised the donor agreed to donate to the Little Rock Chamber of Commerce the real estate described in the contract on condition that "the said Chamber of Commerce by March 1, 1912, shall have made sales of property donated to it amounting in the aggregate to $200,000."

The subscription blanks signed by those who subscribed money were in the following form:

"The undersigned, as subscriber, hereby agrees to purchase _____ dollars in appraised value of real estate from Little Rock Chamber of Commerce acquired by it for industrial and development purposes, and agrees to pay for same; five per cent. upon delivery of contract and two per cent. per month without interest, until fully paid. This purchase is upon the condition that the Little Rock Chamber of Commerce make sales of the property

acquired by it for industrial and development purposes to the aggregate amount of $200,000.

"It is agreed that the Chamber of Commerce will have the real property acquired by it appraised by a committee appointed for that purpose at its probable value on the first day of January, 1917, as enhanced by the probable growth of the city and the use for industrial and development purposes by the Chamber of Commerce of the fund raised for that purpose, and that the subscriber hereto shall have the right of selection of ............................ dollars in value of said property at its appraised value in the order of his subscription, upon notice being given by the Chamber of Commerce that the property is ready to be allotted; and it is further understood that if the subscriber does not promptly apply for his allotment, that the real estate committee which appraised said property shall have the right to make the allotment so that the succeeding subscribers may exercise their right of selection in the order in which their subscriptions were taken.

"It is further agreed that upon said selection or allotment being made, the subscriber will enter into a further formal written contract of purchase of the particular property selected or allotted according to the terms of his subscription, and that upon the subscriber making the five per cent. payment, he shall be entitled to go into the immediate possession of said property, but the Little Rock Chamber of Commerce will retain the title of the property until the payments are fully made, the said contract to contain the usual provisions of forfeiture contained in the contracts in use by the real estate agents of Little Rock where property is sold on the partial payment plan.

"It is further agreed that upon the subscriber making full payments of the purchase price the Little Rock Chamber of Commerce will execute to him a special warranty deed for said property."

Appellant signed the form of contract providing for the payment of money and the acceptance of an allotment of real estate   The committee of the Chamber of Com-

merce made the appraisement of the lands donated and more than four-fifths of the contracts for the donation of lands and the acceptance thereof by the persons who undertook to do so have been performed, but appellant failed to make a selection of his allotment of real estate in accordance with the terms of the contract, and when the allotment to him was made by the committee in accordance with those terms he declined to perform the contract. Compliance with the contract on the part of the Chamber of Commerce is alleged in the complaint, and in this action, instituted by the Chamber of Commerce, offer is made to comply with the contract and the prayer of the complaint is for recovery from defendant of the amount of his subscription, and that he be required to accept the real estate allotted to him.

The contention of counsel for defendant in avoidance of the contract is that it is one for the sale of real estate, and is within the statute of frauds and void by reason of the fact that no particular land was described, but that the undertaking is to purchase land to be secured in the future by the other party to the contract. It is also argued that specific performance should not be decreed for the reason that defendant did not undertake to accept the conveyance of any particular tract of land.

We are of the opinion that the contract when interpreted in the light of its subject-matter and the situation of the parties as set forth in the complaint is not one for the sale of real estate within the meaning of the statute of frauds, but that it is a contract for a subscription by the defendant jointly with others to a common fund to be used for a specified purpose. Such a contract is not within the statute of frauds. The fact that separate contracts were signed by the respective subscribers instead of a joint subscription list does not necessarily show that the several agreements thus executed were not directed to the same end and purpose, nor destroy the mutuality of the undertakings. All of the contracts executed, under the circumstances shown, constituted a joint contract on the part of the subscribers. *Belding* v. *Vaughan,* 108 Ark.

69. And the mutual undertakings expressed in the numerous subscriptions when acted upon by the Chamber of Commerce, which was the agent of the subscribers, constituted a binding consideration. *Rogers* v. *Galloway Female College*, 64 Ark. 627; *David* v. *Chambers*, 123 Ark. 293; 1 Elliott on Contracts, § 229; *Young Men's Christian Association* v. *Estill*, 140 Ga. 291, 48 L. R. A. (N. S.) 783; *Stewart* v. *Trustees, Hamilton College*, 2 Denio (N. Y.) 403; *Norton* v. *Janvier*, 5 Harr. (Del.) 346; *Brown* v. *Marion Commercial Club*, 97 N. E. (Ind.) 358.

It is a mistake, in the interpretation of the contract, for us to leave out of consideration the exact status of the Chamber of Commerce as one of the contracting parties. It was not engaged in the real estate business, nor did it have property for sale about which the parties were contracting. The Chamber of Commerce was acting in a *quasi*-public capacity for the purpose of promoting the welfare of the community, and the contract as a whole constituted it as the agent of the subscribers—to gather together lands to be donated and to allot them among the subscribers who agreed to pay money. It is true that in the contract the subscriber undertook to purchase the land to be allotted to him. He was also designated in the contract as a subscriber. A literal interpretation of the particular words used in the contract might defeat its obvious purpose, and when, as before stated, we interpret the language in the light of the circumstances we can see that the meaning of the contract is that it is an undertaking to subscribe and pay a certain sum of money on conditions specified in the contract, that is to say, the subscriber shall have the right to select his allotment of land in regular turn, or, in the event of his failure to make selection himself, that an allotment will be made to him by the appraisers. This being the effect of the contract, it would be a mistake to treat it merely as a contract for the sale of land. Plaintiff having offered to perform the condition prescribed in the contract by allotting to defendant his part of the land at the appraised value, the right to recover the subscription price is mature and the cause of

action is complete. It is said that this is in effect requiring the specific performance of the contract. Conceding that. such is the effect of the relief granted, it does not follow that relief should be denied merely because the contract, if treated as one for the sale of real estate, would be too indefinite for a court of equity to enforce. The essence of the contract was to pay money upon the condition named, and if it be conceded to be too indefinite to require specific performance when treated as a contract for the sale of lands, yet this does not afford grounds for defendant to escape liability on his subscription contract merely because the effect of the enforcement of the contract is to require him to accept the land allotted to him. He is not bound to accept it, as his acceptance is not a part of the relief afforded to the plaintiff. All that the plaintiff had to do was to tender performance and the relief to which it is entitled is the recovery of the amount of the subscription. The enforced acceptance under the decree of the court is for the benefit of the defendant, and he is not bound to accept the land unless he wishes to do so, but he must pay the subscription because the other party to the contract has offered to perform his part. Decree affirmed.