WILSON v. SPRY.

Opinion delivered July 5, 1920.

1. VENDOR AND PURCHASER—OPTION.—A memorandum of an agreement, with letters concerning it and oral testimony, *held* to prove a contract for an option to purchase lands.

2. FRAUDS, STATUTE OF—SUFFICIENCY OF LETTER AND MEMORANDUM.—Where a vendor made a memorandum of an agreement for an option to purchase land, and mailed to the purchaser a copy of such memorandum with a signed letter stating that he was inclosing a copy of our "memorandum of understanding," which described the lands and set forth the terms of the contract, this was sufficient to meet the requirements of the statute of frauds in an action by the purchaser to enforce specific performance of the contract.

3. VENDOR AND PURCHASER—MUTUAL MISTAKE—RESCISSION.—Where a vendor was of the impression that it was necessary that both parties sign the memorandum of the agreement for it to become binding upon the vendor, but no such idea was entertained by the vendor, there was no such mutual mistake as would entitle the vendor to avoid the contract.

4. VENDOR AND PURCHASER—OPTION—CONSIDERATION.—An agreement to extend the period of an option for a definite time was not without consideration where the purchaser would not buy without making a cruise of the lands which would require additional time and expense and would benefit both parties.

5. VENDOR AND PURCHASER—ACCEPTANCE OF OFFER TO SELL.—If the vendor's memorandum of the agreement with the purchaser should be construed as an offer to sell, instead of an option contract, the contract was completed by an unqualified acceptance.

6. VENDOR AND PURCHASER—ACCEPTANCE OF OPTION AGREEMENT.—Preponderance of the evidence *held* to prove acceptance by the purchaser of an agreement to give an option to buy lands on the vendor's terms.

7. SPECIFIC PERFORMANCE—PARTIES.—In a suit by a purchaser to compel specific performance of an agreement to sell lands, a corporation holding the naked legal title in trust for the vendor was a necessary party.

Appeal from Nevada Chancery Court; *James D. Shaver*, Chancellor; affirmed.

*McRae & Tompkins*, for appellants.

1. The offer to sell such as the memorandum of understanding here was based on no consideration and not binding upon either party until the offer was accepted. Until acceptance the offerer has the right to change or withdraw the offer. 6 R. C. L. 603; 32 Atl. 1120. The money expended by Spry in the examination of the land was not a sufficient consideration as it was no benefit to Wilson. James on Options, § 313; 110 N. Y. S. 176; 146 N. W. 418, 420; 41 So. Rep. 374; 73 Ga. 570; 5 Cal. 302; 19 A. S. R. 205; 68 Md. 21. If the offer had been based upon a sufficient consideration, there was no new consideration for the extension of time, and it was *nudum pactum*. 10 Mont. 5; 24 A. S. R. 17; 68 Md. 21; 6 R. C. L. 604; 110 N. Y. S. 176; 1 Ann. Cas. 986; 87 N. E. 874.

2.   Wilson had the right to prescribe the method of acceptance and it must have been exactly as prescribed. 14 S. E. 249; 17 N. W. 534; 89 *Id*. 1072; 43 L. R. A. (N. S.) 1150; 97 Ark. 613; 13 C. J. 279; 43 Ark. 337; 97 *Id*. 613; 112 *Id*. 380.

3.   There could be no binding contract until Spry paid the first $3,000 as the memorandum specifies. Before the tender was made, the offer was rejected and it was too late to revive it.

4.   There could be no binding contract until Spry signed the memorandum.   41 Pac. 797; 28 Atl. 152.   The minds of the parties never met.   This is a question of intention.   The learned chancellor overlooked the conditions in the letters from Wilson to Spry and from Spry to Wilson.

Where conditions are added, it is a rejection of the offer.   The letters showed an absolute rejection, and not an unconditional acceptance.   The letters and telegram added material conditions and this was a rejection of the offer.   4 L. R. A. 616; 107 A. S. R. 681; 6 L. R. A. 608; 101 U. S. 43-50; 124 Fed. 196; 1 Elliott on Cont., § 39; 21 A. & Eng. Enc. 930.

When once rejected, the party rejecting can not revive the offer by accepting.   6 R. C. L. 608; 119 U. S. 149-151; 10 L. R. A. (N. S.) 1116-7; 1 Elliott on Cont., § 41; 3 Ark. Law Rep. 74; 122 Mo. 667.

5.   Spry never accepted the opinion as the evidence shows.

The court erred in extending the time for Spry to buy for two years from May 1, 1919, instead of from February 16, 1919, contrary to the terms of the memorandum.

6.   The court erred in decreeing specific performance against the trust company.   It pleaded the statute of limitations and it never signed anything.   It held the legal title to the land and Spry did not show what its relation to the land was.   The statute provides that no action shall be brought to charge any person upon any contract for the sale of lands or any interest in them, unless in writing.   Spry has not performed the condi-

tions imposed upon him. Having so failed, his failure is a defense to an action for specific performance. 118 Ark. 283.

*Coleman, Robinson & House,* for appellee.

1. It is Hornbook law that an offer and acceptance constitute a contract. A sufficient consideration is proven for the acceptance of the offer. The memorandum furnishes the written evidence. It was signed by the party to be charged, or against whom it is to be enforced. 72 Ark. 359; 83 *Id.* 149; 101 *Id.* 68. The contract was taken out of the statute of frauds by the memorandum and the letters. 4 C. P. Div. 450; 7 Q. B. Div. 125; 44 Ch. Div. 204; 33 S. C. 367; 22 Oh. St. 62; 81 Ill. 317; Wood on Stat. Frauds, § 364; 95 U. S. 289; 66 Ala. 345; 68 *Id.* 393; 82 *Id.* 417; 20 So. Rep. 587.

2. There could be no binding contract until Spry paid the first $3,000.

3. No new conditions were added to the offer and it was not a rejection of the offer.

4. Spry never accepted the offer or option. 26 R. C. L. 641; 175 Pac. 956. A conditional tender must be strictly followed if accepted or entirely refused. 175 Pac. 956; 55 Mo. 468; 23 Tenn. 490; 61 Barb. 497; 20 Mo. App. 271; 56 Ill. 450; 84 Ill. App. 417.

WOOD, J. This action was brought by the appellee against the appellants to enforce specific performance of a contract of which the following is the memorandum:

"MEMO. OF UNDERSTANDING."

"Between Mr. Spry and Mr. Wilson *re* approximately 10,000 acres in Arkansas owned by Mr. Wilson/ but in the name of Trust & Guarantee Company, Limited, and described in annexed list.

"Mr. Spry to put estimators on at once and complete examination.

"Within forty-five days from today Mr. Spry shall decide whether he wants right to buy, and Mr. Wilson is not to sell in meantime to another.

"Within that forty-five days Mr. Spry may for $24,-000 have the right to buy the land for $200,000 within two years from today.

"If Mr. Spry decides to buy, then the $200,000 shall be paid $50,000 in cash and $50,000 at the end of each year thereafter, with interest on amount unpaid at 6 per cent., payable quarterly. Title to be good and usual provisions for Mr. Spry to search title at his own expense and to have back any part of price paid if title not good, in which event the agreement to be void. Deed to be executed to Mr. Spry and put in escrow upon payment of first $50,000 and to be delivered when whole price paid as stipulated.

"If Mr. Spry after examination, within forty-five days, wants right to buy, he is to pay $3,000 cash and $3,000 at end of each three months, until the $24,000 is paid, or Mr. Spry decides to purchase and pays the $50,-000 cash on price, and these sums to be forfeited if he do not purchase for the $200,000. Mr. Spry may at any time within the two years abandon right to purchase and stop further liability for the $24,000 payments.

"Mr. Wilson to pay proportion of taxes and rates for this year up to date of Mr. Spry's decision and Mr. Spry to pay taxes and rates for time up to his decision as to buying for $200,000.

"This memo not to be binding upon Mr. Spry or Mr. Wilson until Mr. Spry decides within forty-five days that he wants the right to buy and pays the first $3,000. R. E. Ward to continue collecting rent and net surplus after his trouble in looking after same and protecting property to be paid to Mr. Spry during time that Spry pays taxes and rates. February 16, 1919."

Appellee alleged that appellant Wilson was the owner of the lands mentioned in the memorandum. The lands are described in appellee's complaint. He alleged that the title to the lands was in the appellant Trust & Guarantee Company, Ltd., hereafter called company; that the company held the naked legal title for the benefit of appellant Wilson, who owned the lands in fee sim-

ple. He alleged that the time mentioned for exercising the option was extended, and that within the period of such extension appellee exercised the option and offered to purchase the lands on the terms specified and tendered to Wilson the sum of $3,000 as the first cash payment and offered to perform all the things required of him by the option contract; that Wilson refused to carry out the contract. Appellee prayed for specific performance.

The appellants denied the material allegations of the complaint and pleaded the statute of frauds and set up that there was no note or memorandum signed by the parties, and that there was no contract or agreement between them.

The facts are substantially as follows: Wilson, who lived in Canada, owned about 10,000 acres of land in Arkansas which he wished to sell. John C. Spry lived in Chicago and desired to buy this land. On February 6, 1919, Spry and Wilson met at Chatham, Canada. The meeting resulted in an understanding or agreement between Wilson and Spry, a memorandum of which was made in pencil by Wilson at the time, and after Spry left for Chicago, a copy was made by Wilson with a list of the lands attached, was enclosed in a letter written by Wilson and mailed to Spry the next day. In this letter Wilson designated the enclosed instrument as "a copy of our memorandum of understanding," and further said: "We may either sign this memo now or we may leave it until you decide to buy and pay the first $3,000." On February 19, 1919, Spry in a letter to Wilson acknowledged the receipt of the letter and memorandum of understanding, and protested that the time given him for the examination was too short, and asked that the time be extended until May 1st. But he added, "However, we accept your proposition and will do the best we can to finish our examination within the time specified."

Several other letters passed between Wilson and Spry in which Spry was insisting on a definite promise for the extension of time until May 1st to make the examination and to indicate his acceptance or rejection of

the option. The letters revealed that Spry had requested
his attorney and agent Denton to interview Wilson con-
cerning the matter, and Wilson's final word on this sub-
ject was contained in a letter to Spry of March 1, 1919,
in which he says, "Mr. Denton has been at me today to
extend the time until May 1st, for you to make the ex-
amination of the property in Arkansas, and I thought by
my last letter I had gone as far as I should. However,
at Mr. Denton's request I now tell you that if you keep
at the job I will keep on extending the time until you
finish it, but not beyond, however, the 1st of May." In
answer to this letter Spry, among other things, says:
"We wish to complete our examination as promptly as
possible, as it is costing us between $25 and $30 a day to
cruise it. Thanking you for the extension granted and
assuring you that we will complete the work just as soon
as possible," etc. In one of the letters to Wilson, Spry
complained because it was reported to him that other
people had recently been looking over the property, and
he asked Wilson if they had authority from him to do so.
In reply to this letter Wilson stated, "I, of course, would
have no objection whatever to parties examining the
timber with the object of buying it because the memoran-
dum for purchase of right to buy from me has never been
signed by you or myself, and you are perfectly free to
buy any other tract of timber land, as I am perfectly free
to sell to any other person. In another letter Spry in-
formed Wilson that the examination would be completed
by April 29 and requested Wilson to meet him in Toronto
on that date, saying, "By that time we will have com-
plete information as to the property and will be pre-
pared to give you a decided answer as to whether we
desire to purchase." In answer to this letter Wilson
stated that he did not see that it was necessary for Spry
to come to Toronto, and stated further: "If you decide
to take the property, you might sign the memorandum
of agreement which you have in typewriting and for-
ward it to me. * * * If we signed up, then you could in-
struct your solicitor to search the title immediately and

have the sale completed. I am and have been waiting to get your answer.''

In response to other letters from Spry requesting Wilson to meet him in Toronto to talk definitely about that property, Wilson wrote, ''We could not make anything more definite than we have made it, and if you desire to sign that you might write on the back of it as follows, ''To Matthew Wilson: I decide as of 2d April, 1919 (that is, within the 45 days), to take the right to buy within lands on within terms,'' and if you sign that it will complete the matter, and I can then lay it before those interested with me and give you an answer within a very short time.''

In a telegram from Spry to Wilson dated April 28, 1919, Spry urged Wilson to meet him in Toronto, saying, among other things, ''I see no reason why we can not get together. There are some minor matters that should be adjusted prior to signing the agreement which you will doubtless want to discuss with the bank and which I am satisfied will be agreeable to you.'' Wilson testified that he received a 'phone message from Spry asking him to come down to Toronto to see if they could get together on the proposition, that he wanted some changes; that he replied asking Spry to sign the memorandum agreement; that he went to Toronto, within the time of the extension, and met Spry; that Spry paid his expenses in going there, amounting to $25; that about a week or two weeks before that time he had an offer of $250,000 for the land, and that he told Spry about it when they met in Toronto, and further told him that ''if he would sign the memorandum, I would turn the offer over to him and split the profit,'' that he was willing to carry out the terms of the written memorandum, subject to the Bank & Trust Company agreeing to it, but he was presented with a new agreement; that he was not willing to execute a deed according to the terms of that agreement; that he held the land until he lost the offer mentioned, and in a week or two weeks sold it for $5,000 or $6,000 more than his contract with Spry called for.

Wilson further testified that when Spry presented the new agreement he asked Spry what was wrong with the memorandum, why he would not accept that? Spry said the agreement which he produced did not vary much, but it did vary much. It provided that the $3,000 was to be paid when the title was accepted. That was not according to the memorandum, and Spry would not agree to pay the $3,000 until he was satisfied as to the title. Wilson also testified to other particulars which he said Spry insisted on having embodied in the agreement, but which were not contained in the original memorandum; that Wilson did not owe the bank anything; on the contrary he had a large deposit with them; that the bank had no authority to represent him.

Spry testified that Ford, his agent who had examined the property, reported to him on April 28, and he and Ford left that night for Toronto; that he called Wilson over the 'phone at Denton's office in Toronto and told him that he was ready to close up the trade; that he accepted his proposition; that Wilson came on April 30, and he told Wilson that he was ready to close up and pay the first $3,000. In the conversation Wilson stated he had been offered $250,000 for the land and "asked me how I would like to join him and take one-half. I told him that I did not want him to sell my property; that it was my property. Then he went to make up the agreement, and he did not get it up right at the time. * * * In other words, he was proposing a change in the contract. I told him I wanted exactly what we agreed to do, and I could not get him to do anything. I refused to accept the modification that Wilson suggested. I had the $3,000 and tendered it to him. I was financially able to carry out the contract. * * * He was to give us a perfect title. He was to furnish the abstract and we were to do the curing of the title. When we got to Toronto, the reason I did not sign the written memorandum prepared by Mr. Wilson was that he wanted a few little changes about the title. He prepared a new contract and changed it altogether."

On cross-examination Spry testified that "on the 30th of April we tried to arrive at various understandings and modifications in the memorandum, but I told him at the time that I was willing to carry out the original contract."

On redirect examination Spry testified that the land was worth $300,000.

Ford testified that he had been employed by Spry to examine the property and went with him to Toronto to close the deal with Wilson. He was present in Denton's office on April 29th and heard Spry's conversation with Wilson over the 'phone. Spry asked Wilson to come down to Toronto and prepare the necessary papers for closing the contract and told him that he had accepted the proposition and was in Toronto ready to close and pay the money. He was also present part of the time at the meeting in Toronto and heard Spry tell Wilson "I accept your proposition, I am here to close this deal out and I tender you your money." Wilson, Spry, Denton, and witness were present at that time. He testified that $275,000 to $300,000 was a fair market value of the land in April, 1919.

Denton testified that Spry and Ford were in his office and he heard Spry's conversation over the telephone when he called Wilson. Spry told Wilson that he accepted his option on the Arkansas lands and was there prepared to close it. He was also present in the office of the Trust Company where Wilson, Spry, Ford and witness met. He heard Spry say to witness, "I told you yesterday over the telephone that I accepted your offer, and I am here to carry it out and settle up with you." At this conference there was a discussion about the modification of the contract, but no new contract was arrived at.

Denton was a member of the King's counsel in the Province of Ontario, Canada, and the attorney for Spry. The testimony of this witness, which it is unnecessary to set forth further in detail, is to the effect that from the very start of that meeting at the office of the Trust Com-

pany on April 30, Mr. Wilson began backing and trying to get out of carrying out his contract as Spry and witness understood it. He stated that the desire of Spry and witness was to have the memorandum agreement not changed in material particulars, but only reduced to such form as a lawyer would care to see it go out of his office. The only object they had in view was to put the memorandum in definite form. Spry urged upon the witness that he wanted the deal to go through as he expected to make some money out of it. The witness further stated that Spry tendered Wilson the $3,000 and left his check with witness to pay it when Wilson would accept it, and that Wilson made no objection to the manner of the payment.

The court found that Wilson was the owner of the lands in controversy, the title to which was in the Trust Company for the use and benefit of Wilson. That the memorandum was of a contract between Wilson and Spry by which Wilson was to give Spry the option to purchase the lands upon the terms mentioned in the memorandum, provided Spry accepted such option to purchase by May 1, 1919. That Spry did accept the contract by that time and tendered to Wilson $3,000, the same being the first payment according to the terms of the option contract.

The court thereupon entered a decree for a specific performance of the contract for an option according to its terms. From that decree is this appeal.

The memorandum of agreement and the letters concerning it must be considered together in determining whether or not there was a contract between Wilson and Spry for an option to Spry to buy the lands of Wilson. *St. Louis, I. M. & S. Ry. Co.* v. *Beidler,* 45 Ark. 1; *McDonough* v. *Williams,* 77 Ark. 261-72; *Mann* v. *Urquhart,* 89 Ark. 239-47. These, with the oral testimony, unmistakably prove that there was such a contract.

Learned counsel for appellants contend that there was no binding contract between Wilson and Spry because the memorandum had not been signed by Spry,

and because there was no consideration and no mutuality of agreement. As we view the law applicable to the facts of this record, these contentions are untenable for the following reasons: The memorandum of agreement between Wilson and Spry was made in pencil by Wilson at the time the contract was entered into, and on the following day a copy thereof, with a list of the lands, was enclosed in a letter from Wilson to Spry. Even if the memorandum had not been made contemporaneous with the agreement, the letter signed by Wilson and mailed to Spry the next day in which he stated, "I am enclosing you herewith a copy of our memorandum of understanding," was sufficient to meet the requirement of the statute of frauds if the contract were complete in other essentials. For, as stated in Wood on Statutes of Fraud, sec. 345, pp. 649-50: "Where a memorandum in writing is to be proved in compliance with the statute, it differs from a contract in writing in that it may be made at any time after the contract, and before the action is brought. It is not necessary that the memorandum should be contemporaneous with the contract, but it is sufficient that it has been made at any time afterward and then anything under the hand of the party sought to be charged, admitting that he had entered into the agreement, will be sufficient to satisfy the statute, which was only intended to protect parties from having parol agreements imposed upon them." *Baird* v. *Harris*, 209 Fed. 291-5.

Now, a reading of the memorandum will discover that it contains not only the terms of the contract for an option to purchase the lands but also the terms of the option contract itself if Spry decided to take it. There is a clear distinction between the contract for the option and the option contract itself which, to avoid a confusion, must be kept to the fore in the consideration of the facts of this record. The contract for the option was the then present contract being entered into between the parties by which Wilson on his part bound himself to grant to Spry forty-five days to examine the lands and in the meantime bound himself not to sell the

lands to another, and Spry on his part bound himself to put estimators on the land at once and to complete the examination. Here then were parties capable of contracting, a subject-matter, a consideration, and mutual covenants; in other words, all of the essentials of a complete executory contract on the part of Wilson to sell, and on the part of Spry to buy, an option on certain lands of Wilson if before the lapse of the time limit Spry decided to take it.

As the contract was for the sale of lands, there had to be a memorandum thereof and signed by the party to be charged before the same could be enforced. Neither the memorandum itself, nor the testimony *aliunde,* shows that it was the mutual understanding of the parties at the time that the memorandum was to be made and signed before the contract would be binding upon them. True, several of the letters of Wilson indicated that he was of the impression that it was necessary for Spry to sign the memorandum in order to make the same binding upon Wilson; but this was a misapprehension of the law on the part of Wilson. Spry had no such misconception, and it was therefore not a mistake common to both parties, or a mutual mistake that would entitle Wilson to avoid the contract.

Under the statute of frauds, section 3754 of Kirby's Digest: "The party to be charged is the one against whom the contract is sought to be enforced." The contract, by this action, is sought to be enforced against Wilson, and, as we have already seen, the making of the memorandum by Wilson and enclosing the same in a letter signed by him in which he identifies and designates the writing as the 'Memorandum of Understanding' between him and Spry is sufficient, so far as he is concerned, to satisfy the statute of frauds and to bind him to the terms of the contract. *Vance* v. *Newman,* 72 Ark. 359; *Lee* v. *Vaughn,* 101 Ark. 68.

It is a mistake to say that there was no consideration to Wilson for the contract, because Wilson at that time was anxious to sell his lands to Spry, and Spry

would not enter into a contract to buy without the right to make a thorough cruise or examination of the land. To make such a cruise required time—as originally agreed upon, forty-five days—and which time was afterward extended until May 1, 1919. While the cruise was being made, it involved an expenditure on the part of Spry of from $25 to $30 per day. The obligation of making a continuous cruise of the lands within the time limit was imposed upon Spry by the terms of the contract, and the obligation, as we see it, was not alone for the benefit of Spry. Therefore, the case is differentiated by the facts from the cases relied on and cited by counsel for appellants where the contract imposed no condition to be performed by the optionee and where he makes the investigation solely for his own information and benefit. The rule is well established that where the contract binds the promisee, vendee, or optionee to perform some act which will be a real benefit to the promisor, vendor, or optionor, or a real detriment to the promisee, vendee, or optionee, there is a sufficient consideration for the agreement. James on Option Contracts, section 314. *Ex parte Hodges,* 24 Ark. 201; *Rogers* v. *Galloway Female College,* 64 Ark. 627-37; 6 R. C. L., section 67, and cases in note.

We can not agree with counsel that if Wilson for a sufficient consideration gave Spry forty-five days to examine the land there was no consideration for the extension until May 1, 1919, and that the agreement for this extension was a *nudum pactum.* The undisputed testimony, as disclosed by the correspondence shows that Spry in his letter of February 19, 1919, acknowledged the receipt of the "Memorandum of Understanding," and, although accepting the proposition as to the forty-five days, nevertheless, in that letter, began negotiations for an extension of the time and continued the correspondence concerning this until Wilson granted the request. The letters of Wilson show that he was reluctant to grant such request and would not do so until Spry had requested his attorney and special agent Denton to pre-

sent and urge the request in person upon Wilson. This was done, and Wilson closed the negotiation as to this in a letter to Spry in which he says: "However, at Mr. Denton's request I now tell you that if you will keep at the job I will keep on extending the time until you finish it, but not beyond, however, the 1st of May." Spry in answer to this letter thanked Wilson for the extension and stated: "We are sincere and are going right ahead as rapidly as conditions will permit." The consideration exacted by Wilson, and which he deemed sufficient, was a continuous examination. This examination, as we have shown, was costing Spry from $25 to $30 per day and certainly was detrimental to him unless Wilson was bound by his promise to extend the time. The memorandum was what it purports to be, a "memorandum of understanding"— of an oral contract—that was entered into between Wilson and Spry on February 16, 1919.

But, if we are mistaken in this conclusion, and if the memorandum is but an offer to sell, as counsel for appellants insist, still there was a complete contract. For the offer was made in the letter of February 17, 1919, enclosing the memorandum containing the terms of the offer to Spry, and Spry in a letter of February 19, 1919, acknowledged receipt of the letter and stated: "We accept your proposition." This completed the contract for the option. It shows that the minds of the parties had met on the terms of the contract for the option in case Spry decided to take the option within the time granted him. The offer was made and accepted by letter. The contract could be made in that manner. *St. L., I. M. & S. Ry. Co. v. Beidler,* 45 Ark., *supra; Gage v. Black,* 97 Ark. 613; see also, *Kempner v. Cohn,* 47 Ark. 519; *Steen v. Block,* 105 Ark. 513; *Porter v. Gossell,* 112 Ark. 380. The acceptance of Wilson's offer by Spry converted the offer into a binding contract. 6 R. C. L., section 27, p. 605.

Considering the memorandum and the letter enclosing it as an offer to Spry to sell him an option contract

on certain terms, there was nothing in the memorandum or the letter specifying that the offer must be accepted by signing the memorandum. On the contrary, Wilson expressly stated: "We may either sign this memorandum now or we may leave it until you decide to buy and pay the first $3,000.

We conclude, therefore, that, from whatever angle the facts of this record may be viewed, they show a complete executory contract between Wilson and Spry for an option to Spry to buy Wilson's lands upon terms which were definite and specified in the memorandum. The contract for the option contemplated that, if Spry decided to take the option, then the option contract itself was to be entered into upon the terms also specified in the memorandum of the contract for the option.

The next question is, did Spry comply with the terms of the contract for the option so as to entitle him to the option thereof? The terms of the contract for the option required Spry to complete the examination and, if he decided to take the option, and pay the $3,000 cash for the option, to notify Wilson of that fact not later than May 1, 1919.

The undisputed testimony shows that Spry kept his estimators on the lands until the cruise was completed. Spry testified, and he was corroborated by two witnesses, to the effect that on the 29th and 30th of April he notified Wilson that he had accepted his proposition to buy the option; that he was ready to close the deal; and tendered to Wilson a check for the cash payment.

There is a decided conflict in the evidence as to whether Spry accepted the option to buy on the original terms. Wilson testified that when, in response to Spry's invitation, he met Spry in Toronto to close the deal, Spry presented him with a new agreement in which Spry had altered the original terms of the option contract, and which he (Wilson) refused to accept because they were so altered. Spry, on the other hand, testified to the contrary, and that he was willing to take the option on the terms originally proposed, that his purpose was not to

change the option contract in any essential particulars, but to have same framed and couched in fitting terminology for such contracts. A preponderance of the evidence on this point sustains the contention of Spry. After Spry decided to buy, and notified Wilson that he accepted his proposition and tendered him the first cash payment, of course, he was entirely within his rights in insisting that the option contract, the terms of which had been stated in the memorandum, be reduced to writing and clothed in appropriate language for such a contract.

If Spry decided to buy the option contract under the terms agreed upon, he was to pay $3,000 cash and $3,000 at the end of each three months until the $24,000 was paid. As the time that the original contract for the option had to run was extended until May 1, 1919, the payment or tender of payment of $3,000 cash on that day had the effect of extending the option for three months or until July 30, when the second payment was due, and so on in accordance with the terms of the contract until the $24,000, the consideration for the option contract, was paid.

The company held the naked legal title to the lands, but it held this title in trust for Wilson. The company had no beneficial interest whatsoever in the lands, and it was only a necessary party in order that it might be required to make a deed and thus effectuate specific performance by Wilson, in the event Spry exercised his option and complied with its terms.

Inasmuch as Spry had complied with the contract for the option, he was entitled to have Wilson specifically perform that contract.

The findings and decree of the trial court were in accordance with the opinion herein expressed. The decree is therefore correct, and it is affirmed.